IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

KELLEY ANN DIX,
    Plaintiff,

vs.                                     Case No. 3:11cv308/MCR/EMT

MICHAEL J. ASTRUE,
Commissioner of the Social Security Administration,
    Defendant.
_____/

## REPORT AND RECOMMENDATION

       This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D) and 72.3 of this court relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. § 401, *et seq*. It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.

       Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are supported by substantial evidence; thus, the decision of the Commissioner should be affirmed.

I.     PROCEDURAL HISTORY

       On March 15, 2007, Plaintiff filed an application for DIB and alleged therein disability beginning March 27, 2005 (Tr. 16).[1] Her application was denied initially and on reconsideration, and Plaintiff requested a hearing before an administrative law judge ("ALJ"). An initial hearing was held on August 21, 2009, and a supplemental hearing was held on March 19, 2010 (Tr. 16, 35, 58). On March 25, 2010, the ALJ issued a decision in which he found Plaintiff "not disabled," as defined

---

[1] All references to "Tr." refer to the transcript of Social Security Administration record filed on September 1, 2011 (Doc. 5). Moreover, the page numbers refer to those found on the lower right-hand corner of each page of the transcript, as opposed to those assigned by the court's electronic docketing system.

under the Act, at any time through the date of his decision (Tr. 16–30). On April 27, 2011, after considering additional evidence submitted by Plaintiff, the Appeals Council ("AC") denied Plaintiff's request for review (Tr. 1). Thus, the ALJ's decision and the AC's denial of review stand together as the final decision of the Commissioner, subject to review in this court. *See* Ingram v. Comm'r of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007). This appeal followed.

II.    FINDINGS OF THE ALJ

On March 25, 2010, the ALJ made several findings relative to the issues raised in this appeal (Tr. 16–30):

1) Plaintiff met the insured status requirements of the Act through December 31, 2010.[2]

2) Plaintiff did not engage in substantial gainful activity after March 27, 2005.

3) During the relevant period, Plaintiff had the following severe impairments: somatoform disorder, attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, hypothyroidism, skin rash disorder, anxiety disorder, headaches, and cervical degenerative disc disease ("DDD").

4) Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment.

5) Plaintiff had the residual functional capacity ("RFC") to perform medium work[3] with certain exceptions, including—relevant to the issues raised in this appeal—only occasional interaction with the general public, coworkers, or supervisors, and an ability to frequently understand, remember and carry out simple one and two-step instructions or tasks but no such ability as to complex instructions or tasks.

6) Plaintiff could not perform her past relevant work,[4] but she could perform other jobs that existed in significant numbers in the national economy; thus, Plaintiff was not disabled from March 27, 2005, through March 25, 2010, the date of the ALJ's decision.

III.    STANDARD OF REVIEW

---

[2] Thus, the time frame most relevant to this appeal is March 27, 2005 (alleged onset) to December 31, 2010 (date last insured or "DLI"), although the ALJ issued his decision approximately nine months prior to Plaintiff's DLI.

[3] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

[4] "Past relevant work is work that [a claimant has] done within the past 15 years, that was substantial gainful activity, and that lasted long enough for [the claimant] to learn to do it." 20 C.F.R. § 404.1560(b)(1).

Case 3:11-cv-00308-MCR-EMT   Document 9   Filed 05/22/12   Page 3 of 17

Page 3 of 17

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214 (11th Cir. 1991).  As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995).  Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence.  Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id*. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1. If the claimant is performing substantial gainful activity, she is not disabled.

2. If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3. If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4. If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5. Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her RFC and vocational factors, she is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. 20 C.F.R. § 404.1512. If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform. MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986). If the Commissioner carries this burden, the claimant must then prove she cannot perform the work suggested by the Commissioner. Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV. PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY

    A. Personal and Employment History

Plaintiff was born on April 14, 1963, and thus was forty-one years of age on the date she alleges she became disabled (Tr. 28). She has past relevant work as a retail salesperson and other previous work as customer service representative and cashier (Tr. 28, 202). In a disability report submitted in connection with her DIB application, Plaintiff indicated she last worked on March 27, 2005, and she stated she quit working at that time because her "doctor told [her] to" and because her

"skin condition was very bad" (Tr. 201).  She indicated she was also limited in her ability to work due to "bipolar, skin condition and social isolation" (*id.*).

    B.    Relevant Medical History[5]

        <u>Physical</u>

Plaintiff suffers from a recurrent rash, which predominately appears on her legs and is sometimes accompanied by sores.  She also has headaches and neck or upper back pain.  A cervical spine x-ray obtained on April 27, 2009, revealed mild DDD (Tr. 376).  A physical examination resulted in findings of normal strength in the upper extremities, normal range of motion, and no paravertebral muscle spasm.  Additionally, Plaintiff underwent thyroid surgery and reported using thyroid hormone replacement medications following the surgery.

        <u>Mental</u>

On March 2, 2006, Plaintiff underwent a psychiatric evaluation by Jacqueline S. Aregood, M.D., of the Lakeview Center (Tr. 301–04).  Dr. Aregood noted that Plaintiff's "overall pattern of thought [was] disorganized, and she [was] somewhat difficult to communicate with and at times [had] pressured speech" (Tr. 303).  Dr. Aregood assessed a Global Assessment of Functioning ("GAF") score of 55.[6]  In a treatment note dated March 30, 2006, Dr. Aregood noted some difficulty with Plaintiff's communication skills and the organization of her thoughts and speech, and she assessed a GAF score of 50[7] (Tr. 305).  Plaintiff continued treatment with Dr. Aregood (and/or an advanced registered nurse practitioner ("ARNP") at Lakeview) through November 2006 (*see* Tr.

---

    [5] Unless otherwise indicated, the information in this section is derived from the opinion of the ALJ.  Moreover, the undersigned notes that the ALJ has thoroughly summarized Plaintiff's history of medical treatment in his opinion (*see* Tr. 18–28), and Plaintiff's entire history need not be repeated.  However, a brief overview is provided here, and supplemented *infra*, to place Plaintiff's claims for relief in context.

    [6] GAF is the overall level at which an individual functions, including social, occupational, academic, and other areas of personal performance.  American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u>  30–32 (4th ed. 1994) ("DSM-IV").  It may be expressed as a numerical score.  *Id.* at 32.  A score between 51 and 60 reflects <u>moderate</u> symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning  (e.g., few friends, conflicts with peers or co-workers).  *Id.*

    [7] A GAF score between 41 and 50 reflects <u>serious</u> symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any <u>serious</u> impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  *Id.*  The score assessed on March 30, 2006, is the only score in the record that falls withing the "serious symptom" range.  As will be seen, the majority of Plaintiff's GAF scores fall within the "moderate symptom" range.

306–13). Plaintiff's diagnoses included mood disorder, not otherwise specified, and hypomania, secondary to steroid use versus underlying bipolar disorder secondary, and her GAF scores ranged between 55 and 68[8] (Tr. 306, 307, 309, 311, 313 (reflecting GAF scores of 55, 56, 59, and 68)).

Albert Fink, Ph.D., performed a consultative examination of Plaintiff on April 20, 2007 (Tr. 316–19). Dr. Fink noted that Plaintiff was alert, fully oriented, and cognitively intact (Tr. 318). He reported that Plaintiff had no psychotic symptoms, but she had excessive verbalizations (Tr. 318–19). Dr. Fink opined that Plaintiff would likely "have difficulty maintaining employment given the 'excessiveness' of her interaction style" (Tr. 319).

Plaintiff returned to Lakeview in February 2009. She was treated for a "dual diagnosis" as a result of the combination of her mental impairments and a substance abuse disorder (detected, in part, by Plaintiff's arrest and loss of driver's license for driving under the influence ("DUI")). John Sarazin, M.D., examined Plaintiff in June 2009 and assessed a GAF score of 55. He also restarted Plaintiff on medications, including Lexapro.

In November 2009, Plaintiff was examined by John Duffy, Ph.D., and assessed with bipolar disorder, somatoform disorder, and ADHD. Dr. Duffy opined in relevant part that Plaintiff had only mild limitations in the ability to understand, remember, and carry out simple instructions and moderate limitations in the ability to interact appropriately with the public, supervisors, coworkers, or respond to changes in a work routine.

V.   DISCUSSION

Plaintiff raises two issues in this appeal. She asserts that her case should be remanded to allow the ALJ to consider "new and material" evidence which documents the severity of her headaches (Doc. 7 at 9–12). Plaintiff also asserts that the ALJ erred in failing to assign "great weight" to Dr. Fink's opinion that she would likely have difficulty maintaining employment due to the excessiveness of her interaction style (*id.* at 8–9).

  A.  New Evidence Submitted to the AC Related to Plaintiff's Headaches

---

[8] A score between 61 and 70 reflects some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well and has some meaningful interpersonal relationships. DSM-IV. There are at least two GAF scores in the record that fall within the "mild symptom" range (*see* Tr. 306, 319).

As previously noted, on March 25, 2010, the ALJ issued a decision denying Plaintiff's claim for DIB. Thereafter, in connection with Plaintiff's request for review of the ALJ's decision, she submitted additional evidence to the AC (*see* Tr. 1, 4). The additional evidence includes, relevant to the instant claim for relief, treatment records from October 12, 2009, through July 19, 2010 (Tr. 434–51). On April 27, 2011, after considering this evidence, the AC denied Plaintiff's request for review (Tr. 1–4). Plaintiff contends the AC erred in denying review because the new records demonstrate the severity of her headaches and require remand to the ALJ to consider the records.

In its notice denying review, the AC specifically stated it had considered the additional evidence presented by Plaintiff, as well as the reasons Plaintiff disagreed with the ALJ's decision (Tr. 1–2). The AC concluded, however, that the additional information provided no "basis for changing the [ALJ's] decision" (Tr. 2). The AC thus did not err by failing to consider the new evidence. *See* Keeton v. Dep't of Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994). Moreover, to the extent Plaintiff contends the AC was required to explain its denial of review, the contention fails. *See* Burgin v. Comm'r of Social Sec., 420 Fed. Appx. 901, 903 (11th Cir. 2011) ("The AC considered and incorporated the additional evidence submitted by Burgin into the record. Contrary to Burgin's argument, the AC was not required to explain its denial of review.") (citing Ingram, 496 F.3d at 1261). This court must therefore determine whether the "new evidence renders the denial of benefits erroneous." Ingram, 496 F.3d at 1262. To do so, the court must first review the relevant medical evidence that was before the ALJ, and the additional evidence submitted by Plaintiff to the AC. Thus, this evidence is summarized here before the merits of Plaintiff's claim are addressed.[9]

Records in Plaintiff's File Prior to Issuance of the ALJ's Decision

On December 5, 2006, Plaintiff presented to the Santa Rosa Community Clinic ("SRCC") with complaints of headaches "behind [her] eyes" (Tr. 280). Plaintiff stated she treated the headaches with Advil or rest (*id.*). She was assessed with frontal headaches, secondary to her thyroid

---

[9] In this court's scheduling order, issued September 13, 2011, Plaintiff was specifically warned that, "Failure by either party to support factual contentions with accurate, precise citations to the record will result in the contention(s) being disregarded for lack of proper development." (Doc. 6 at 2) (emphasis in original). Thus, in summarizing the relevant evidence, the court largely relies only on those portions of the record identified by Plaintiff (*see* Doc. 7).

Case No. 3:11cv308/MCR/EMT

condition, and directed to continue Levothroid, a thyroid medicine (it does not appear that Plaintiff was prescribed anything specifically for her headaches) (*see* Tr. 280–82). On June 14, 2007, in connection with her DUI offense, Plaintiff underwent a mental health assessment and advised the therapist that she "gets pressure headaches" (Tr. 361). She also reported taking Zyprexa (for bipolar disorder), Hydroxyzine (an antihistamine), and Levothyroxine (for her thyroid condition) (*see id.*). Plaintiff was assessed with bipolar disorder, hyperthyroidism, allergies, headaches, and a GAF score of 60 (Tr. 362). Plaintiff returned to the SRCC in December 2008 and reported having headaches "off [and] on for one month"; she was again assessed with headaches secondary to her thyroid condition but—apparently—not prescribed any medications specifically for her headaches (*see* Tr. 369). SRCC treatment records from February 2009 reflect additional complaints of headaches by Plaintiff, as well as reports of pain in the back of her head and upper neck that "rad[iates] to [an illegible] area" (Tr. 384). The February 2009 records also reflect reports by Plaintiff that "ibuprofen helps" her headaches and/or pain (*see id.*). SRCC records dated March 26, 2009, reflect Plaintiff's report of continued headaches, as well as a diagnosis of chronic headaches and prescriptions (or recommendations) for Levothyroxine, Aleve, and Extra Strength Tylenol (Tr. 382). Finally, SRCC notes from April 2009 reflect a diagnosis of chronic headaches, a notation that Plaintiff was out of medication, and a reference to the cervical spine x-ray obtained in February 2009 (Tr. 379).[10]

---

[10] The ALJ stated the following regarding Plaintiff's headache-related complaints and treatment:

[Plaintiff] also has reported headaches two or three times during treatment (Exhibits 4F [Tr. 278–95] and 23F [377–85]). She testified that she has very significant headache symptoms. Although the symptoms alleged are not reported during treatment to the extent she testified, these impairments have caused more than a minimal limitation in the claimant's ability to work and must be considered a severe impairment.

\* \* \*

In terms of the claimant's . . . back impairment, headaches, and hypothyroidism, the claimant's alleged limitations are not fully supported by the medical evidence. Despite the claimant's significant allegations regarding her headaches, she has sought little treatment for this impairment. She stated that they can last two or three days. However, she testified that she has relief by applying warm compresses. She has been prescribed some pain medications but there is no evidence of significant treatment for migraines or other headache related conditions. The claimant has been diagnosed with cervical [DDD]. She also reported, like her headaches, that this impairment causes pain in her head, neck, and shoulders. However, the claimant's x-ray showed that the cervical DDD was only considered mild. Moreover, the first treatment received for this impairment was only in 2009. The

Records Submitted by Plaintiff to the AC (and not considered by the ALJ)

Plaintiff presented to the SRCC on December 16, 2009, with complaints of headaches that had been "occurring for years," which were primarily in her neck and associated with stress (Tr. 449). Plaintiff was assessed with tension headaches and prescribed a thirty-day supply of Darvocet (at one tablet per day), with no refills, and a ninety-day supply of ibuprofen (at three tablets per day), with two refills (Tr. 450). Plaintiff returned to the SRCC on February 3, 2010, and reported a severe headache that had been "occurring for days" (Tr. 447). Although Plaintiff's shoulder was tender, she had full range of motion in all joints and muscles (Tr. 448). Plaintiff was assessed with muscle spasm (described as "cervical with headache") and tension headache (*id.*). Her Darvocet prescription was renewed and Robaxin (a muscle relaxer) was added (*id.*). Plaintiff returned on March 15, 2010, and although she reported recurring headaches, she noted they were "eased" with Darvocet (Tr. 445). Plaintiff's assessments and medications remained generally the same (*see* Tr. 446).

On April 28, 2010, approximately one month after the ALJ rendered his decision, Plaintiff presented to the SRCC and complained of migraine headaches (Tr. 442). She blamed her worsening headaches on "increased stress" and "bad weather" (*id.*). Plaintiff reported, however, that she "just wanted medication refills" and did not want to try any different medications (*id.*). Plaintiff was assessed with tension headaches, and her Darovcet prescription was renewed (Tr. 443). On May 27, 2010, Plaintiff saw an ARNP and reported having headaches every week and noted that some "last

---

claimant has reported headaches throughout treatment but their frequency and intensity has not ever been reported as she alleges. The claimant's report of a headache "behind her eyes" on December 5, 2006, and she reported taking Advil [sic]. However, at that time the treatment notes at Santa Rosa Community Clinic show that her lowered thyroid hormone level may cause her headache as well. Nevertheless, there was little further follow-up treatment. The claimant reported another instance of a headache during treatment at the Santa Rosa Community Clinic in April 2009. She stated that she was out of her headache medication, and this headache was secondary to her cervical spine pain according to the treatment notes (Exhibits 4F and 23F). The claimant also described having pressure headaches during her treatment . . . subsequent to her DUI. The claimant testified that she was prescribed an antihistamine, an antipsychotic, and thyroid medication at that time (Exhibit 16F [Tr. 349–63]). However, her significant lack of ongoing treatment for her headaches and lack of specific treatment for her headaches does not support her complaint of significant headaches. Nevertheless, the pain experienced as a combination of these impairments would limit the claimant's ability to perform the heaviest exertion in lifting or carrying. Moreover, some minimal, temporary limitation in her ability to concentrate would be a likely result of these impairments.

(Tr. 19, 23).

Case No. 3:11cv308/MCR/EMT

for days"; she requested a refill of the Darvocet (Tr. 439). The ARNP stated as follows: "The onset of headaches has been variable and has been occurring for years. Frequency (EVERY WEEK, LASTS FOR DAYS SOMETIMES) and tension. RELIEVED BY DARVOCET." (Tr. 439) (capitalization in original). Plaintiff was assessed with tension headaches, and the Darvocet was renewed (Tr. 440). Additionally, during the May 27 visit, the ARNP examined Plaintiff's eyes and noted that Plaintiff's right pupil was larger than her left pupil (*id.*). Thus, Plaintiff was assessed with anisocoria, and the ARNP noted, "This [the anisocoria] may be congenital, but must rule out more serious cause with worsening headaches." (*id.*). Plaintiff was therefore advised to undergo a computerized tomography scan ("CT") of the brain and to follow up after obtaining the CT (*id.*). When Plaintiff returned to the SRCC in June 2010, she reported she had not obtained the CT because she could not afford it; she was advised of the importance of obtaining the CT and told to "get it as soon as possible" (Tr. 437). The ARNP also made the following notation regarding Plaintiff's headaches: "Encouraged ice packs, topical muscle relaxer such as BIOFREEZE for neck (she does not like oral muscle relaxers). I think her headaches are muscle tension related, but we are obliged to get a CT due to the anisocoria." (Tr. 438). The final record, also from the SRCC, reflects an office visit by Plaintiff on July 19, 2010, at which Plaintiff was seen by Ronald Maddux, M.D. (Tr. 434). Plaintiff again reported headaches, but she stated they were "ok with Darvocet" (*id.*). And, unlike earlier office visits, during which Plaintiff reported the presence of headaches (*see, e.g.*, Tr. 437, 439, 442), no headache was reported or detected at Plaintiff's office visit in July 2010 (*see* Tr. 434–35). Dr. Maddux assessed tension headache and advised Plaintiff to return in two to three months (Tr. 435). Additionally, although Dr. Maddux detected unequal pupils as the ARNP did before, he did not assess anisocoria and did not mention a CT or the need for a CT in the treatment record (*see* Tr. 434–35).

Analysis

If a claimant submits new noncumulative and material evidence to the AC after the ALJ's decision, the AC shall consider such evidence, but "only where it relates to the period on or before" the date of the ALJ's decision. 20 C.F.R. § 404.970(b). "Material" evidence is evidence that is "relevant and probative so that there is a reasonable possibility that it would change the administrative result." Milano v. Bowen, 809 F.2d 763, 766 (11th Cir. 1987) (quotation omitted).

When evidence is submitted for the first time to the AC, that new evidence becomes part of the administrative record. Keeton, 21 F.3d at 1067. The AC considers the entire record, including the new, material, and chronologically relevant evidence, and will review the ALJ's decision if the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b). Finally, as previously noted, when the AC has considered the new evidence and denied review, this court must determine "whether the new evidence renders the denial of benefits erroneous." Ingram, 496 F.3d at 1262.

Here, the only treatment records that specifically relate to the period on or before the date of the ALJ's decision are those documenting Plaintiff's treatment at the SRCC on December 16, 2009, February 3, 2010, and March 15, 2010. Thus, these are the records relevant to the determination of whether the denial of benefits to Plaintiff was erroneous. *See* 20 C.F.R. § 404.970(b); *see also, e.g.*, Smith v. Social Sec'y Admin., 272 Fed. Appx. 789, 800–02 (11th Cir. 2008) (finding no error in AC's decision denying review of ALJ's decision where new evidence was not new and material and/or did not relate to the period on or before the ALJ's decision). Having carefully reviewed the relevant records, the undersigned easily concludes that they do not render the denial of benefits erroneous.

Initially, while the relevant or "new" records reflect that Plaintiff was prescribed Darvocet, and the records before the ALJ apparently do not include such prescriptions, the new records also establish that Plaintiff was able to ease her headaches by using Darvocet. *See* Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988) ("A medical condition that can reasonably be remedied either by surgery, treatment, or medication is not disabling.") (citation omitted); Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (citations and quotation omitted). Moreover, the new records do not undermine the ALJ's pertinent findings as to Plaintiff's headaches. For example, the ALJ found that Plaintiff's headaches were a severe impairment, and he included restrictions related to them in Plaintiff's RFC (*e.g.*, lifting or carrying restrictions, concentration limitations). The ALJ also found that: (1) Plaintiff sought little treatment for her headaches; (2) although Plaintiff reported headaches that last several days, she can relieve them; (3) Plaintiff obtained no significant treatment for her migraines or other headache-related conditions; and (4) although Plaintiff reported having DDD that

causes pain in her head, neck and shoulders, the cervical x-ray revealed only mild DDD (Tr. 23; *see also* n.10, *supra*). None of these findings are refuted by the records submitted by Plaintiff to the AC.[11]

Furthermore, Plaintiff's own arguments concerning the relevant records do not provide a basis for concluding that the denial of benefits was erroneous. Plaintiff states only as follows:

> On December 16, 2009, [Plaintiff] complained of headaches to the Santa Rosa Community Clinic, "The patient is a 46 year old female who presents with a complaint of headache. The headache has been occurring for years. Primarily in neck and assoc [sic] with stress." (T. 449). The headaches were evident in 2010 as well. On February 3, 2010, she was treated for complaints of headaches: "The patient is a 46 year old female who presents with a complaint of headache. The headache has been occurring for days. Tension. Has been on DCN frequently and says that is the only thing that works." (T. 447).

(Doc. 7 at 4–5).

Indeed, upon review of Plaintiff's brief, it seems her arguments in support of this claim for relief are largely based on the records that post-date the ALJ's decision (*see id.* at 5–6, 9 (relying on the SRCC treatment records from April, May, and June 2010)). Plaintiff's arguments thus appear to be based on a misunderstanding of the Regulations (and/or an unawareness of the Eleventh Circuit's decision in Ingram, 496 F.3d at 1253, which Plaintiff does not cite in her brief). Plaintiff cites Vega v. Comm'r of Soc. Sec'y, 265 F.3d 1214, 1218 (11th Cir. 2001) in connection with her argument that the May 2010 records from SRCC—which suggest the need for a CT scan due to Plaintiff's reports of worsening headaches and the observation of unequal pupils—are new, non-cumulative, and material records, such that remand is required for further consideration of the severity of Plaintiff's headaches (*see* Doc. 7 at 10–11). Plaintiff also asserts that good cause exists for her failure to submit the records earlier because they did not exist until after the ALJ issued his decision (*id.* at 11). Plaintiff's reliance on Vega, however, is misguided.

Section 405(g) permits a district court to remand an application for benefits to the Commissioner by two methods: (1) under sentence four of the statutory provision, the court may enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social

---

[11] As to finding number (2), the ALJ found Plaintiff could relieve her headaches by using warm compresses or taking ibuprofen. Similarly, the new records reflect that Plaintiff could relieve her headaches by taking Darvocet.

Security, with or without remanding the cause for a rehearing"; or (2) under sentence six, the court may "order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding."  42 U.S.C. § 405(g). Sentence-six and sentence-four remands are designed to remedy separate problems.  Ingram, 496 F.3d at 1261.  Sentence-six remands are "available when evidence not presented to the Commissioner at any stage of the administrative process requires further review."  *Id.* at 1267. Sentence six "does not grant a district court the power to remand for reconsideration of evidence previously considered by the [AC]."  *Id.* at 1269.  Thus, remand to the Commissioner is warranted under sentence six when (1) new, noncumulative evidence exists, (2) the evidence is material, and (3) good cause exists for the claimant's failure to submit the evidence at the administrative level. *See* Vega, 265 F.3d at 1218; Ingram, 496 F.3d at 1267 (noting that remand is "proper under sentence six when new material evidence that was not incorporated into the administrative record for good cause comes to the attention of the district court"; thus, remand here under sentence six would be improper).

In contrast, a sentence-four remand is appropriate when the evidence was properly before the Commissioner, but "the [AC] did not adequately consider the additional evidence."  Ingram, 496 F.3d at 1268 (quotation omitted).  Under sentence four of § 405(g), the district court must generally "consider evidence not submitted to the administrative law judge but considered by the [AC] when that court reviews the Commissioner's final decision denying Social Security benefits."  *Id.* at 1257–58; *see also, id.* at 1265–69 (suggesting that the "good-cause" standard, for failing to timely submit evidence, is immaterial to sentence-four situations where evidence is submitted to the AC and incorporated into the administrative record).  A sentence four remand is unwarranted if there is no "reasonable possibility that [the new evidence] would change the administrative result."  Milano, 809 F.2d at 766.  *See also* Jackson v. Chater, 99 F.3d 1086, 1091–92 (11th Cir. 1996) (generally speaking, to warrant a sentence-four remand this court must either find that the decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim).

Here, for the reasons explained *supra*, the relevant evidence submitted to the AC does not render the denial of benefits to Plaintiff erroneous. Stated another way, there exists no reasonable possibility that the new evidence would change the administrative result.[12] Additionally, the record reflects that the Commissioner correctly applied the law in considering Plaintiff's claim. Thus, Plaintiff is not entitled to a remand under sentence four of § 405(g).

B.   The Opinion of Dr. Fink

As previously noted, Plaintiff underwent a consultative examination by Dr. Fink in April 2007. In relevant part, Dr. Fink observed that Plaintiff "presented as alert, fully oriented, and cognitively intact with no evidence of psychotic symptoms" (Tr. 318). Dr. Fink also stated that Plaintiff displayed a positive mood that verged on euphoria and that she engaged in "excessive . . . verbalizations" (Tr. 319). Additionally, Dr. Fink assessed a GAF score of 68, opined that Plaintiff would have difficulty maintaining employment due to the "excessiveness" of her interaction style, and concluded that Plaintiff prognosis would be positive with treatment (*id.*). Plaintiff contends the ALJ erred because he did not provide "explicit and adequate reasons" for discounting Dr. Fink's opinion that she would have difficulty maintaining employment due to the excessiveness of her interaction style (Doc. 7 at 9).

Although the ALJ did not specifically comment on Dr. Fink's opinion that Plaintiff would have difficulty maintaining employment, any error in his failure to do so is harmless. The ALJ did not altogether ignore the evidence as to Dr. Fink. The ALJ specifically noted that Plaintiff was examined by Dr. Fink, <u>and he acknowledged Dr. Fink's statement that Plaintiff talked excessively</u> (*see* Tr. 25) (which statement is, of course, the basis for Dr. Fink's opinion Plaintiff would have

---

[12] The undersigned notes that even if the evidence presented to the AC that <u>post-dates</u> the ALJ's decision is considered, the Commissioner's final decision remains substantially supported by the record as a whole. Although a CT scan was recommended in May and June 2010, after the ARNP detected unequal pupils, Dr. Maddux did not reiterate the need for a CT at Plaintiff's last visit in July 2010, even though he also observed unequal pupils. Moreover, it is clear that the CT was recommended in an abundance of caution, in light of the anisocoria, and that Plaintiff's treatment providers thought her headaches were "muscle tension related," such that a CT would otherwise be unnecessary. Furthermore, there is no evidence reflecting that Plaintiff actually obtained the CT; thus, if her case was remanded there apparently would be no CT results to consider. Regardless, at Plaintiff's last visit to the SRCC, on July 19, 2010, Plaintiff stated her headaches were "ok with Darvocet"; she reported no headaches that day; and Dr. Maddux told Plaintiff she need not return to the SRCC for two to three months. Given that Plaintiff previously was treated, on average, on a monthly basis at the SRCC, the recommended "two to three-month" interval is significant and consistent with a conclusion that Plaintiff's headaches were under control.

difficulty maintaining employment).  Moreover, the ALJ's ultimate determinations adequately account for Plaintiff's excessive verbalization and, correspondingly, Dr. Fink's opinions.

The ALJ determined that Plaintiff has "moderate difficulties" in social functioning and "concentration, persistence or pace," and that Plaintiff should be limited to only occasional interaction with the general public, coworkers, or supervisors (Tr. 21, 27).  Additionally, relying on the opinions of the vocational expert ("VE"), the ALJ determined that Plaintiff could not return to her past relevant work as a retail salesperson because that work is "customer oriented" and precluded by the limitation in Plaintiff's RFC to only occasional interaction with the public (*see* Tr. 28, 52–53).  The VE also opined, however, that the same limitation would not preclude Plaintiff from performing other available work, including work as a hand packager, linen room attendant, and self-service dry clean attendant (Tr. 53–54).  The ALJ relied upon the VE's latter opinions in finding Plaintiff "not disabled."

Dr. Fink's opinion, that Plaintiff would have difficulty maintaining employment due to the excessiveness of her interaction style, may reasonably be construed as stating that Plaintiff cannot work in a job where she would frequently encounter others due to her excessive manner of speaking. And, the ALJ accounted for this opinion by limiting Plaintiff to jobs—such as that of a hand packager—where Plaintiff would be expected to work mainly with "things" as opposed to "persons."[13]  Therefore, any error by the ALJ in failing to recite Dr. Fink's precise opinion or identify reasons for rejecting it is harmless.  See East v. Barnhart, 197 Fed. Appx. 899, 901 n.3 (11th Cir. 2006) (failure to mention psychologist's report harmless where findings in report were consistent with ALJ's ultimate determination); Pichette v. Barnhart, 185 Fed. Appx. 855, 856 (11th Cir. 2006) (ALJ's erroneous statements found to be harmless where ALJ applied proper legal standard); Diorio v. Heckler, 721 F.2d 726, 728 (11th Cir. 1983) (misstatements harmless where ALJ applied correct legal standard despite the first misstatement, and the second misstatement was irrelevant); Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003) (the harmless error inquiry

---

[13] The VE identified the Dictionary of Occupational Titles ("DOT") code for the hand packager job as 920.587-018 (Tr. 53).  In relevant part, this job is described in the DOT as "[p]ackag[ing] materials and products manually" and "tend[ing] packaging machines."  *See, e.g.*, http://www.occupationalinfo.org/92/920587018.html (last visited May 15, 2012).

Case No. 3:11cv308/MCR/EMT

involves determining "whether the ALJ would have reached the same decision denying benefits, even if he had followed the proper procedure . . . .").

While the discussion could end here, the undersigned includes two additional points that further support the conclusion that Plaintiff is not entitled to relief on this claim. First, in discussing Plaintiff's credibility, the ALJ noted that Dr. Fink assessed Plaintiff with a GAF score of 68 (Tr. 26). This GAF score reflects only mild symptoms, which is seemingly inconsistent with an opinion that Plaintiff is unable to work. Moreover, Plaintiff's RFC is more restrictive than what the GAF score suggests, since the RFC includes moderate difficulties in social functioning. Second, the ALJ also noted Dr. Fink's opinion that Plaintiff's prognosis was positive with treatment (Tr. 26), an opinion that is substantiated by the mental health treatment records Plaintiff submitted to the AC (*see, e.g.*, Tr. 426 (Lakeview treatment record documenting Plaintiff's report that, "I don't get on my talking sprees like I used to."); Tr. 427 (treatment record reflecting an observation by Dr. Sarazin that Plaintiff's "speech is nonpressured, spontaneous, normal in tone, rate and volume, [and] coherent and goal directed")). As noted *supra*, a condition that can reasonably be remedied by treatment is not disabling. Dawkins, 848 F.2d at 1213.

For the foregoing reasons, the Commissioner's decision is supported by substantial evidence and should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560. Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to close the file.

At Pensacola, Florida this 22nd day of May 2012.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>. A copy of any objections shall be served upon any other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; <u>United States v. Roberts</u>, 858 F.2d 698, 701 (11th Cir. 1988).